Argued and submitted January 27, affirmed November 8, 2006

STATE OF OREGON,
*Respondent,*

*v.*

CHAD E. HINTON,
*Appellant.*

MI-03-0832; A124901

147 P3d 345

Michael R. McLane argued the cause and filed the brief for appellant.

Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were

Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

Defendant appeals his conviction for criminal trespass with a firearm under ORS 164.265, which the state prosecuted as a violation.[1] The sole issue on appeal is whether the trial court correctly denied defendant's motion for a judgment of acquittal made on the ground that the state failed to prove that the private property on which defendant entered and remained was not open to the public. We affirm.

For the most part, the pertinent facts are not disputed. To the extent the evidence conflicts, we view the record in the light most favorable to the state, giving the state the benefit of all reasonable inferences. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994).

The charge against defendant arose when defendant trespassed onto private property owned by the GI Ranch, which is located in rural Crook County. The land in that area is open high desert, consisting of hills, sagebrush, and juniper trees. The GI Ranch is expansive—it is 44 miles wide, 69 miles long, and totals just under half a million acres. But it is not all contiguous. In and around the property privately owned by the GI Ranch are sections of public land owned by the federal government and managed by the Bureau of Land Management (BLM). In effect, the GI Ranch land is interspersed, in checkerboard fashion, with occasional sections of BLM land. The public may, without permission, enter and remain on BLM land to hunt and for other recreational purposes. The GI Ranch, however, is private; entry is by permission only.

Although some of the boundaries for the GI Ranch are fenced, many of its boundaries are not. Where its property borders the main roads in the area, the GI Ranch has posted large four-foot by eight-foot signs alerting the public that its land is private. Persons who want to hunt and recreate on BLM property customarily use maps to identify where BLM property borders the public roads. They then enter the

---

[1] Although the offense ordinarily is a misdemeanor, the state opted to treat the charge as a violation. Under ORS 153.076(2), that choice on the state's part reduced the standard of proof to a preponderance of the evidence.

BLM property at those "jumping off" points, leaving their vehicles parked at the roadside. No fences or signs mark the interior section boundaries between BLM land and the GI Ranch. Because the area is all high desert, BLM land and the GI Ranch land is largely physically indistinguishable. Consequently, once on BLM property, hunters and other BLM land users customarily continue to consult topographical maps to ensure that they stay on BLM property and do not trespass onto the private land owned by the GI Ranch. Even with a map, it is difficult to identify exactly where the boundaries lie and to know "the very second" that one crosses from BLM land to GI Ranch land. Using a map, however, a person can know generally whether he or she is on private or BLM land while traversing the area.

The events that led to the charge in this case occurred when defendant and three friends decided to camp and hunt elk on what is known as the Silveys area, an area of BLM property that is located in and around the GI Ranch. They camped in a high timbered area near a place called Buck Springs. On the day in question, they left their camp, drove on a county road to another camp area called Juniper Springs, and then decided to do a wide sweep through the BLM sections in that area, looking for elk. The group of four split into groups of two. Defendant went with his friend, Brian, who was not a hunter and who was along only because he enjoyed camping and being outdoors. Brian had not spent much time in the area before. Defendant had hunted on the other side of the county road, but this was his first time hunting in the Silveys area and he did not know the area well. Defendant wanted to know where he was going, so he relied on another member of the group of four, Jeremy, to show them where they could hunt. Before the four started out, Jeremy used a map to show defendant where, specifically, they would hunt. The map identified 16 square sections of land that were BLM property. At trial, defendant was still able to point out on a map "where exactly" they planned on walking and where they came out when they finished their day of hunting.

Beginning early in the morning, the two groups took off from Juniper Springs. They hunted most of the day, walking "a lot" and going up and down hills all day long. While

they were hunting, the two groups stayed in contact with each other by using two-way radios. Although there may have been a map in the backpack that Brian carried, neither defendant nor Brian looked at a map while hunting. Brian believed that defendant knew where he was going.

Later in the day, defendant and Brian got a call on their radio from Jeremy. Jeremy advised them that he had shot an elk and needed defendant's and Brian's help to load it. To find him and the downed elk, Jeremy told defendant to spot a particular butte, go up it, and then look down to the bottom of a ravine, or draw—defendant would then see Jeremy at the bottom with the elk. Following those instructions, defendant and Brian located the butte, climbed a ridge above the draw, went down the draw, and helped load the elk onto Jeremy's four-wheeler. Jeremy left on the four-wheeler in the same direction from which he had driven into the draw. Defendant and Brian went back up to the top of the ridge. They initially intended to hunt their way back to camp. Once they were back on top of the ridge, however, they could tell that their camp was a lot farther away than they had thought. By then, it was late and getting cold. So they instead went to Buck Creek Road, where they hoped that they would meet up with their ride.

The elk that defendant helped load onto the four-wheeler was shot in the approximate center of section 13, which is a one-mile-square section of private land owned by the GI Ranch. While defendant and his friends were loading the elk onto the four-wheeler in the middle of section 13, a person connected with the GI Ranch witnessed their activities and notified the state police. A state fish and game wildlife officer investigated the report and later met up with defendant and his friends. The officer determined that defendant had a firearm while he was on the GI Ranch's property and cited defendant for trespass with a firearm, pursuant to ORS 164.265.

According to a Sportsman Series BLM topographical map that defendant introduced into evidence at trial, section 13 is something of an "island" within several sections of BLM land.[2] Section 13 is bordered on the north and the west by

---

[2] The Sportsman Series BLM map evidently is representative of the maps customarily used by hunters and other recreational users of BLM land in this area. It

one-mile-square sections of BLM land, and BLM land also lies to the northwest of section 13. Also, according to that map, BLM land partially borders section 13 on its eastern boundary. Buck Creek Road, which is public, traverses the southeastern quarter of section 13 and then runs through BLM land in adjoining sections. No fences mark the boundary between section 13 and the neighboring BLM land. Nor are signs posted to warn persons using BLM property where those boundaries are located. Using a map, however, the officer who investigated the trespass report determined that the downed elk had been shot and loaded onto the four-wheeler on land owned by the GI Ranch, not on BLM land. The remains of the elk were at the bottom of a "steep-sided draw," at the top of which is a "distinct ridge" and a big open flat area that must be crossed to get to BLM land. From that distinctive topography, the officer had no difficulty determining that, when he located the elk's remains, he was in the center of section 13 and not on the bordering BLM land.

■        After being cited for criminal trespass while in possession of a firearm, defendant was prosecuted in a trial to the court. At the outset of the trial, as noted, the state opted to prosecute the charge as a violation, rather than a misdemeanor. As a result, the parties and the trial court agreed that the state did not have to prove that defendant "knowingly" trespassed on the GI Ranch.[3] At the conclusion of the state's case, defendant moved for a judgment of acquittal. In support of the motion, defendant argued that the state had failed to establish that the property was not open to the

_____

is a large-scale map that depicts the ownership of various sections of land using different colors. Privately owned land is colored white. BLM land is pale yellow. Roads, trails, lakes, streams, creeks, power lines, mines, and similar physical landmarks are distinctively marked. The map also shows the topography of the area using colored contour lines to indicate elevation changes for hills, bluffs, ridges, valleys, and draws.

    [3] *See* ORS 161.105(1)(a) ("[A] culpable mental state is not required if: The offense constitutes a violation unless a culpable mental state is expressly included in the definition of the offense[.]"). Defendant did not object to the state's decision to treat the charge as a violation nor take issue with whether the state could dispense with its obligation to prove a mental state by treating the charge as a violation. We therefore express no view as to whether the parties and the trial court below correctly concluded that ORS 161.105(1)(a) dispenses with the obligation to prove a culpable mental state when this particular charge is prosecuted as a violation.

public. The trial court denied the motion, and defendant assigns that ruling as error on appeal.

■ To put defendant's argument in better perspective, we begin by describing the disputed element of the offense. Under ORS 164.265, a person is guilty of the crime of criminal trespass while in possession of a firearm if, among other things, the person "enters or remains unlawfully in or upon premises." As relevant here, a person enters or remains unlawfully in or on premises if, at the time of the entry or remaining, the premises were not "open to the public." ORS 164.205(3). Premises "open to the public" are premises that, "by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required." ORS 164.205(4). In other words, the premises must in some way—physically or as a matter of custom or through "other circumstances"—objectively cause a reasonable person to believe that he or she is free to enter or remain on the property without permission, even if subjectively the owner intends the property to be private and requires permission to be there.

In moving for a judgment of acquittal, defendant emphasized that it was legal for defendant to be on BLM land and that no fences or signs existed to mark the boundary between the BLM land and section 13. As a result, according to defendant, there was nothing that would cause a reasonable person to believe that he or she was going "from land that was legally permissible to be on to land that you need permission to be on." On appeal, defendant renews that argument and urges that the analysis depends on the character of the property "at the time [defendant] entered it" and whether a reasonable person would have known from the property's physical nature, function, custom, usage, or other circumstances that permission to enter section 13 was required. Defendant thus argues:

> "The evidence presented at trial shows that there was nothing about the border between BLM land and the GI Ranch where defendant walked that would cause a reasonable person to believe that permission was required to enter. The landscape was the same. There was no fence. There were no signs posted. The border between the GI

Ranch and the BLM [land] was in the middle of thousands of acres of the high desert of central Oregon."

In response, the state argues that, as a matter of local custom and usage, hunters in this area know that the GI Ranch land is private and use maps to distinguish private GI Ranch land from BLM land to ensure that they hunt on BLM land only. As a result, according to the state, "reasonable persons would know they would have the burden of figuring out (through a map or a GPS or previous experience) which land was BLM land and which land was privately owned" rather than relying on fences, signs, or other physical evidence of the boundary between those properties.

We do not agree that, at least given the facts in this case, the analysis turns on a reasonable person's ability to determine the location of the *boundary between* the GI Ranch's section 13 and the BLM land. Under ORS 164.265, criminal trespass while in possession of a firearm is committed if a person "enters or remains" unlawfully on premises not open to the public. Consistently with the statute, the state pleaded that defendant unlawfully entered *or remained* on GI Ranch land. The state therefore could satisfy its burden of proof by proving that, at some point, a reasonable person in defendant's position would have known that he had entered GI Ranch land or that he was on GI Ranch land and was remaining there.

The state presented such evidence in this case. Specifically, the record provides ample evidence that, using maps, people in this area can determine generally where they are and whether they are on GI Ranch land or BLM land. To be sure, they may not be able to know "the very second" that they cross onto private land. But, viewed in the state's favor, the record establishes that reasonable people can know generally once they have made the crossing.

The record further establishes that a reasonable person in defendant's position could have determined in this particular instance—and in the circumstances in which defendant found himself—that he or she had crossed onto and was remaining on GI Ranch land. As we have described, the downed elk was located near the center of section 13, which is owned by the GI Ranch, is marked on local maps as private

land, and is one mile square in size. To reach the center of that section, defendant and his friend necessarily not only crossed the boundary between BLM land and the GI Ranch, they continued on foot for approximately one-half mile into the interior of the privately owned section. A trier of fact rationally could find that, using a map, a reasonable person in defendant's position could have determined in fairly short order that he had crossed onto GI Ranch land, even if he would not have known the instant that he first did so. Moreover, the topography of the land in that area was distinctive. The downed elk was at the bottom of a steep draw. To access that area, defendant had to approach a distinct ridge line, one that was easy to identify on a map as being in the center of section 13. From that evidence, a trier of fact could also readily find that a reasonable person in defendant's position would have known that, at the point where he located Jeremy and the downed elk, he had entered GI Ranch property and was remaining on it.

In short, the evidence is sufficient to permit a rational trier of fact to find that a reasonable person in defendant's circumstances could have and would have determined that he had entered, was crossing, and was remaining on GI Ranch land, even if that person could not pinpoint precisely where he first entered that land.[4] The trial court therefore correctly denied defendant's motion for judgment of acquittal.

Affirmed.

---

[4] As our discussion implies, we reject the possible suggestion in the state's argument, which the trial court may have endorsed, that a person can be convicted of criminal trespass merely for entering or remaining on private property, when the offense is treated as a violation instead of a misdemeanor. Regardless of how the charge is prosecuted, the statute requires a determination of whether a reasonable person would conclude, from the objective circumstances, that premises on which he or she entered or remained were not open to the public. If, for example, the state's evidence showed that a person in defendant's circumstances would have concluded after reading a map, wrongly but reasonably, that he or she was on BLM land rather than GI Ranch land, the state's burden of proof would not be satisfied.