Argued and submitted October 28, 2014, affirmed May 6, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MATTHEW ELAN SHAPIRO,
*Defendant-Appellant.*

Multnomah County Circuit Court
120532087; A153263

349 P3d 608

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Andrew M. Lavin, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

Defendant appeals a judgment of conviction of one count of second-degree burglary, ORS 164.215, and one count of third-degree theft, ORS 164.043. While a patient in the emergency department at Oregon Health and Science University (OHSU), defendant left the emergency department and entered a waiting room in another area of the hospital late at night, after visiting hours were over and when access was controlled by a security guard. Surveillance video showed defendant removing an unidentifiable object from a purse in the waiting room; the purse's owner later reported that money was missing. On appeal, defendant argues that the trial court should have granted his motion for a judgment of acquittal on both the burglary and the theft counts. We reject defendant's challenge to his theft conviction without further written discussion. With respect to defendant's burglary conviction, defendant argues that the state failed to adduce sufficient evidence that the waiting room was "not open to the public." We conclude that the evidence was sufficient and affirm the judgment.

Because defendant's assignments of error are to the denial of his motions for judgments of acquittal, we view the record in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994), *abrogated on other grounds by State v. Mills*, 354 Or 350, 312 P3d 515 (2013). Defendant was a frequent visitor to the OHSU campus. He had more than 120 interactions with OHSU security over the course of several years, some of which resulted in defendant being arrested, cited for trespass, or escorted off the campus. Security personnel informed defendant that he was allowed to seek treatment from the emergency department, but that he was prohibited from being anywhere else on OHSU property. Prior to 2011, defendant was subject at various times to exclusion orders, pursuant to which he was prohibited from being on the OHSU campus except for emergency medical care or scheduled medical appointments. According to OHSU policy, a violation of an exclusion order can result in a person being arrested for trespassing. In early 2011, however, OHSU changed its procedures regarding exclusion orders. One of the results of that change was that previous exclusion orders were

nullified. It is, therefore, undisputed that, on March 29 and March 30, 2012, the dates at issue in this case, defendant was not actually subject to an order excluding him from any part of the OHSU campus. There is no evidence in the record, however, that defendant was ever notified about the exclusion orders being lifted.

On the night of March 29, defendant was admitted to the OHSU emergency department. The nature of defendant's condition and treatment are not reflected in the record. At 2:51 a.m., security officer Kurepa received a call that defendant was not in his room and needed to return for more treatment. Kurepa located defendant in the reception area on the ninth floor of a building called the south hospital. The emergency department is on the eighth floor of a different building, the Hatfield Research Center. Kurepa escorted defendant back to the emergency department. After defendant's treatment was concluded, Kurepa escorted him off the campus at 4:15 a.m.

OHSU's intensive care unit (ICU) is in a building called Kohler Pavilion. At 5:00 a.m. a woman, Corral, who had been asleep in the ICU waiting room, woke up and noticed that her purse had been moved from where she had left it to a nearby counter or desk. The purse was open, and Corral's wallet was sitting on top of it. The wallet contained no money. In response to the incident, OHSU security checked surveillance video, which showed defendant entering the ICU waiting room sometime between 12:30 a.m. and 2:30 a.m., walking off-camera toward the area where Corral was sleeping, returning with a purse, setting the purse on the counter, looking through it, placing something in his pocket, and leaving.

Defendant was charged with one count of second-degree burglary (Count 1) and one count of second-degree theft (Count 2). Defendant waived his right to a jury trial, and the case was tried to the court. At trial, the state offered testimony from OHSU security personnel, who explained the security measures used to restrict movement around the OHSU campus. Detective Sergeant Johnstun testified that, after 9:00 p.m., all the outside doors that could be used to access Kohler Pavilion are locked to anyone without a key

card. Thus, the only way for defendant to access the ICU would be to walk from the emergency department entrance, located in the Hatfield Research Center, through the south hospital and into the Kohler Pavilion. Indoor walkways connect all three buildings; signs indicate which building a person is in. There are no locked doors between the emergency department and the ICU. There is, however, a security guard stationed between the emergency department and the south hospital. Kurepa testified that that guard's job is to make sure unauthorized persons are not wandering into other parts of the hospital. Thus, anyone wishing to leave the emergency department must check in with that security guard. For visitors, standard procedure would be for the guard to ask where a person is headed, request a piece of ID, and write that person's name in a logbook. OHSU patients are given a white bracelet with their name, medical record number, and date of birth. Kurepa testified that, most of the time, the security guard would not stop and question persons wearing a white bracelet.

At the close of the state's case, defendant moved for a judgment of acquittal on both counts. As to the burglary count, defendant argued that the state had failed to prove an unlawful entry because a reasonable person in defendant's position would have believed that the ICU waiting room was open to the public. The trial court denied defendant's motions. Defendant was convicted by the court on Count 1. On Count 2, the court convicted defendant of the lesser offense of third-degree theft.

On appeal, defendant assigns error to the denial of his motion for a judgment of acquittal, reprising his arguments to the trial court regarding the sufficiency of the evidence. We review a trial court's denial of a motion for a judgment of acquittal to determine "whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989).

A "person commits the crime of burglary in the second degree if the person enters or remains unlawfully in a building with intent to commit a crime therein." ORS

164.215(1). In this case, the state was required to prove that defendant entered or remained on premises that, at the time, were "not open to the public" and that defendant was not "licensed or privileged" to be there. ORS 164.205(3)(a)[1]; *State v. Davis*, 261 Or App 38, 42, 323 P3d 276 (2014). The phrase "[o]pen to the public," in turn, is statutorily defined to mean "premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required." ORS 164.205(4). The test for whether a building is "open to the public" is an objective one; if the premises do not in some way cause a reasonable person to believe that he or she must seek permission to enter, it does not matter that the building's owner may have subjectively intended the premises to be made private. *State v. Hinton*, 209 Or App 210, 216, 147 P3d 345 (2006). In making that assessment, the court considers the perspective of a reasonable person in defendant's position at the time of the entry. *Id.* at 218; *Davis*, 261 Or App at 46.

In defendant's view, the issue in this case is "whether a reasonable person *who is permissibly in the emergency department of the hospital as a patient* would feel that permission was required to enter or remain in the ICU waiting room." (Emphasis added.) But defendant conflates two separate issues. Whether a building is "[o]pen to the public" depends on whether "permission to enter or remain is required." ORS 164.205(4). Or, stated differently, a building is closed to the public when access is "restricted to certain people." *Davis*, 261 Or App at 45. Of course, a certain class of persons—such as hospital patients—may be granted a license or privilege to enter such a building. That does not mean that the building is open to the *general* public. *See, e.g.*, *State v. Etzel*, 264 Or App 732, 738, 333 P3d 1147, *rev den*,

---

[1] ORS 164.205(c) provides another means of unlawful entry: "To enter premises that are open to the public after being lawfully directed not to enter the premises[.]" The state does not contend that defendant violated this provision. As noted, the record appears to show that, although defendant had previously been ordered to stay away from the OHSU campus, no such order was in effect on the date at issue.

356 Or 575 (2014) (holding that tennis club was "not open to the public" even though club members had free access to the building.[2]

We conclude that the trial court did not err when it denied defendant's motion for a judgment of acquittal on the burglary charge. When viewed in the light most favorable to the state, the facts establish that the only way for defendant to access the ICU waiting room after 9:00 p.m. was to enter through the emergency department and walk past a security guard. The evidence further establishes that that guard's duty is to stop unauthorized persons from entering into the rest of the hospital. To that end, the guard would typically allow admitted patients to pass the security desk, but would stop visitors to make sure they had a reason to continue into the hospital. That is evidence from which a reasonable finder of fact could infer that defendant entered into a building that was "restricted to certain people," and not "open to the general public." *Davis*, 261 Or App at 45.

The manner in which OHSU has restricted access to its buildings makes this case different than *State v.*

---

[2] Defendant's theory that a hospital building is "open to the public" if it is open to admitted patients appears to be based on his reading of *Hinton*. According to defendant, under *Hinton*, "the question is whether a reasonable person *in the defendant's circumstances* would believe that permission was required to enter or remain in the premises." (Emphasis in original.) Defendant overstates our holding in *Hinton*. In that case, the defendant trespassed onto private property while hunting in Eastern Oregon. *Hinton*, 209 Or App at 212. The owners had done nothing to mark the boundary between their "one-mile-square section of private land" and the surrounding public lands. *Id*. at 214-15. Nevertheless, as a matter of "local custom and usage" hunters relied on maps to distinguish between public and private land. *Id*. at 217. We concluded that, although people may not know the "very second" that they cross onto private land, there was ample evidence that people can determine "generally" whether they were on private or public land. *Id*. We also concluded that, because defendant entered an area marked by "distinctive" topography that was "in the center" of the private property, a rational trier of fact could find that a person in "defendant's circumstances could have and would have determined that he had entered, was crossing, and was remaining on" premises that are not open to the public. *Id*. at 218. Thus, *Hinton* stands for the proposition that the state must prove that a reasonable person in the defendant's position could have *determined* that the property in question was "not open to the public." *Id*. at 214. That is simply another way of saying that the "not open to the public" test turns on objective factors rather than the subjective intentions of the owner. *Hinton* did not hold that whether property is "not open to the public" itself depends on the circumstances of a particular person—*e.g.*, one's status as an admitted hospital patient.

*Pittman*, 223 Or App 596, 196 P3d 1030 (2008). In that case, the defendant entered the premises of a wholesale florist that catered to retail flower shops. *Id.* at 598. We concluded, however, that the owner's intent to establish a "wholesale" business to cater to a particular subset of the general public would not have necessarily conveyed the impression that nonflorists were required to seek special permission to enter the premises. *Id.* at 599-600. We then went on to note that other objective factors—the presence of an automatic sliding door, displays of flowers, a customer counter, and a cashier—would all suggest to a reasonable person that no "permission to enter or remain was needed." *Id.* at 600. In this case, by contrast, the presence of a security guard station functioned to actually restrict the rest of the OHSU campus to a specific subset of persons.

In short, a reasonable finder of fact could have concluded that the building housing the ICU waiting room was "not open to the public" at the time that defendant entered it. To convict defendant of burglary, the state also was required to prove that defendant was not "licensed or privileged" to be in the ICU waiting room. On appeal, defendant does not expressly argue that he had such a license or privilege. Rather, as noted earlier, he appears to subsume that question into the "not open to the public" analysis (by arguing that someone in his position as an admitted patient would have reasonably believed that he could freely wander around). Nonetheless, to the extent that defendant intended to assert a license or privilege to enter the ICU waiting room, he is incorrect.

It is true that defendant was admitted to the hospital as a patient and that, according to the testimony of OHSU security officers, security guards typically do not prevent patients from leaving the emergency department and entering other areas of the hospital. There is, however, ample evidence that, on numerous occasions, security personnel specifically told defendant that he was forbidden to wander into other parts of the OHSU campus.[3] Defendant argues that the exclusion orders had been nullified on the date at issue;

---

[3] During trial, Kurepa and the prosecuting attorney had the following exchange:

although that is true, that means only that defendant was not subject to arrest for disregarding the orders. It does not follow that defendant *had permission* to be present in areas of the OHSU campus that he had been repeatedly forbidden to enter. Nor is there any indication that defendant actually believed (or had any reason to believe) that those repeated directives to him had ceased to be in effect. In short, there is evidence from which a reasonable trier of fact could conclude that defendant was not licensed or privileged to enter into the ICU waiting room in the Kohler Pavilion after hours.

Affirmed.

---

"[The State:] Now, assuming that [defendant's] treatment had been completed by that time would you have allowed him to stay there in the ninth floor of the South Hospital?

"[Kurepa:] Absolutely not.

"[The State:] Why not?

"[Kurepa:] Because [defendant] was excluded from OHSU three times in the past and the time that he was arrested, like, why we're here in court, that was the fourth time.

"[Defendant], like, committed, like, several thefts and he also refused to leave after the treatments and he was escorted off number—number of times by other officers."

Kurepa also testified that he had personally talked to defendant and told him he was not to go into other OHSU buildings. As Kurepa explained,

"I told [defendant] what any other officer at OHSU told [him], which is that he was more than welcome to come to [the] emergency department for emergency care only and after being seen in the emergency department he is to leave campus immediately.

"If he's found anywhere else on OHSU property *** he was subject to arrest.

"[The State:] Okay. How many times would you say you've had that conversation with [defendant]?

"[Kurepa:] A lot. Almost every time when—when I was primary on the call. If I was not, if I was a cover officer, then the officer who was primary would tell him that.

"[The State:] Okay. So more than once you have had that conversation with [defendant]?

"[Kurepa:] Oh, yes, sir."